(Slip Opinion)

# Application of the Statutory Pay Cap on Administratively Determined Pay in 5 U.S.C. § 5373 to the National Science Foundation

The statutory pay cap on administratively determined pay in 5 U.S.C. § 5373 applies to the salaries that the National Science Foundation Director fixes under 42 U.S.C. § 1873(a)(1). Because some NSF employees are currently receiving salaries above section 5373's cap, NSF must promptly take steps to come into compliance with the pay cap. NSF lacks the authority to continue to pay salaries above the cap for the purpose of mitigating the effect that implementing the cap will have on its employees.

November 29, 2023

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
NATIONAL SCIENCE FOUNDATION

Congress gave the Director of the National Science Foundation ("NSF") broad authority to fix the pay of NSF employees by administrative action. *See* 42 U.S.C. § 1873(a)(1). Congress also, however, imposed a government-wide cap on such administratively determined pay in 5 U.S.C. § 5373. Earlier this year, the Office of Personnel Management ("OPM") contacted NSF to express its concern that some NSF employees may be receiving salaries above that cap. After review, NSF tentatively agreed that it lacked the authority to pay its employees above section 5373's cap and that some employees were receiving salaries above the cap. NSF then sought this Office's views on two questions: First, does the government-wide cap apply to the NSF Director's pay-fixing authority? Second, if so, can NSF lawfully continue paying above-cap salaries for a finite period in order to lessen the impact of bringing these employees' pay in line with the cap, based on theories of equitable discretion, detrimental reliance, or otherwise?[1]

---

[1] We received OPM's views on both questions. *See* Memorandum for Gillian E. Metzger, Deputy Assistant Attorney General, Office of Legal Counsel, from Webb Lyons, General Counsel, OPM, *Re: Request for the Office of Personnel Management's Views re Whether the National Science Foundation Pay Authority in 42 U.S.C. § 1873(a)(1) Is Subject to the Cap on Administratively Determined Compensation in 5 U.S.C. § 5373* (Aug. 18, 2023) ("OPM Memorandum"). OPM believes that "the pay of [the relevant] employees is subject to the . . . cap in 5 U.S.C. § 5373," *id.* at 1–2, and is "not aware of any legal authority that would allow NSF to prospectively pay [these] employees in

The answer to the first question is yes. The relevant statutes make clear that the pay cap applies to NSF employees. The answer to the second question is no. The pay cap governs, and we have found no authority that would permit NSF to exceed the pay cap based on a desire (no matter how understandable) to lessen the impact on employees who have been receiving more than the pay cap statute permits. Although we recognize that NSF's pay system is complicated and cannot change overnight, we think NSF's authority stretches no further than taking the time necessary to implement the pay cap in an orderly fashion.

## I.

Two relevant statutes govern NSF's compensation authority. First, NSF's organic statute grants the NSF Director authority to administratively determine the compensation of NSF employees—authority that is especially broad as to NSF's technical and professional personnel. The relevant provision, 42 U.S.C. § 1873(a)(1), specifies:

> The Director shall . . . appoint and fix the compensation of such personnel as may be necessary to carry out the provisions of this chapter. . . . [S]uch appointments shall be made and such compensation shall be fixed in accordance with the provisions of title 5 governing appointments in the competitive service, and the provisions of chapter 51 and subchapter III of chapter 53 of title 5 relating to classification and General Schedule pay rates: *Provided*, That the Director may . . . employ such technical and professional personnel and fix their compensation, without regard to such provisions, as he may deem necessary for the discharge of the responsibilities of the Foundation under this chapter.

42 U.S.C. § 1873(a)(1).

Second, Congress has enacted a government-wide cap on administratively determined pay. In the Government Employees Salary Reform Act of 1964, Congress created an "executive schedule" for "the key management and policymaking positions in the Federal Service." *Int'l Org. of Masters, Mates & Pilots v. Brown*, 698 F.2d 536, 541, 542 (D.C. Cir.

---

excess of the applicable caps" for the purpose of easing the burden on the employees. *Id.* at 9.

1983); Government Employees Salary Reform Act of 1964, Pub. L. No. 88-426, 78 Stat. 400. In 5 U.S.C. § 5373, enacted as part of that Act, Congress imposed a "cap to ensure that the salaries of the new executive ranks remained above the pay of civil servants with special professional skills." *Int'l Org.*, 698 F.2d at 541. Section 5373 specifies:

> [N]otwithstanding the provisions of other statutes, the head of an Executive agency . . . who is authorized to fix by administrative action the annual rate of basic pay for a position or employee may not fix the rate at more than the rate for level IV of the Executive Schedule. This section does not impair the authorities provided by— [list of excluded agencies that does not include NSF[2]].

5 U.S.C. § 5373. Section 5373 thus "supersede[d] the authorities, contained in . . . various provisions of law[,] to fix rates of compensation at rates above the" cap, H.R. Rep. No. 88-1388, at 32 (1964), and "prohibit[ed] *any employee* whose salary can be fixed by administrative action from receiving more than" the cap, other than at the excluded agencies, S. Rep. No. 88-1121, at 20 (1964) (emphasis added). Creating that "catch-all" cap furthered Congress's goal of "streamlin[ing] [the] pay system for key executives and . . . fasten[ing] that system above the top rungs of the various civil service pay ladders." *Int'l Org.*, 698 F.2d at 542.

We think it clear that section 5373's cap applies to pay that the NSF Director fixes under section 1873. Section 5373's cap applies "notwithstanding the provisions of other statutes." In general, "such a 'notwithstanding' clause clearly signals the . . . intention that the provisions of the 'notwithstanding' section override conflicting provisions." *Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993). And here, this clause confirms that "Congress wanted the pay cap to cut a wide swath." *Int'l Org.*, 698 F.2d at 542. Indeed, that inference is all the stronger because section 5373 identifies agency pay-setting authorities to which it does not apply— specifically those of the Federal Reserve Board, Comptroller of the Cur-

---

[2] The statutory provisions excepted from 5 U.S.C. § 5373 are: "(1) sections 248, 482, 1766, and 1819 of title 12, section 206 of the Bank Conservation Act, sections 2B(b) and 21A(e)(4) of the Federal Home Loan Bank Act, section 2A(i) of the Home Owners' Loan Act, and sections 5.11 and 5.58 of the Farm Credit Act of 1971; (2) section 831b of title 16; (3) sections 403a-403c, 403e-403h, and 403j of title 50; or (4) section 4802. (4) [sic] section 2(a)(7) of the Commodity Exchange Act (7 U.S.C. 2(a)(7))."

rency, National Credit Union Administration Board, Federal Deposit Insurance Corporation, Farm Credit Administration Board, Farm Credit System Insurance Corporation, Tennessee Valley Authority, Central Intelligence Agency, Securities and Exchange Commission, and the Commodity Futures Trading Commission. 5 U.S.C. § 5373(a). Notably absent is NSF. "Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." *TRW Inc. v. Andrews*, 534 U.S. 19, 28 (2001) (quoting *Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616–17 (1980)); *see Int'l Org.*, 698 F.2d at 542 ("Congress deliberately and expressly carved out certain exceptions to [the administrative cap provision] for certain pay-setting authorities, but did not exempt the mariners."); *In re Marine Officers—Limitation on Pay for Crews of Vessels*, 56 Comp. Gen. 870, 873 (1977) ("[T]he statute provides specific exclusions from coverage . . . indicat[ing] that it should apply to all cases not specifically excluded.").

Far from indicating a contrary legislative intent, the text of section 1873(a)(1) confirms that it does not supersede section 5373's government-wide cap. Section 1873(a)(1) generally requires the Director to appoint and fix the compensation of NSF employees in accordance with two specific sets of provisions—"the provisions of title 5 governing appointment in the competitive service" and "the provisions of chapter 51 and subchapter III of chapter 53 of title 5 relating to classification and General Schedule pay rates." 42 U.S.C. § 1873(a)(1). It further authorizes the Director to ignore those two sets of provisions in setting the pay for "technical and professional personnel." *Id.* Neither set of provisions, however, includes section 5373, which addresses pay, not "appointment in the competitive service," and appears in subchapter VII of Chapter 53, not in chapter 51 or subchapter III of chapter 53. *See* Civil Service Reform Act of 1978, Pub. L. No. 95-454, § 801(a)(3)(A)(ii), 92 Stat. 1111, 1221.[3] And when Congress gives an agency "the option of disregarding only certain parts of title 5," an agency may not assume "additional implicit

---

[3] This fact has remained true across recodifications. The pay cap was initially codified at 5 U.S.C. § 5363, in subchapter VI of Chapter 53 of title 5. It was then recodified as 5 U.S.C. § 5373 in subchapter VII of Chapter 53 of title 5 in 1978. Pub. L. No. 95-454, § 801(a)(3)(A)(ii). Never, however, has the pay cap appeared in "subchapter III of chapter 53 of title 5."

exemption[s]" from the remainder of title 5. *Lal v. Merit Sys. Prot. Bd.*, 821 F.3d 1376, 1381 (Fed. Cir. 2016) (internal quotation and citation omitted). Indeed, "[t]o interpret the section as giving . . . the option to disregard additional, unenumerated parts of title 5 would run afoul of the maxim '*expressio unius est exclusio alterius*,' and in a domain where . . . Congress knows how to exempt a civil service position from the protections found in . . . title 5 if it so desires." *King v. Briggs*, 83 F.3d 1384, 1388 (Fed. Cir. 1996).

The history of section 1873 confirms that Congress did not intend to except NSF's employees from the government-wide cap. Congress amended section 1873 in 1968, just four years after enacting section 5373's cap. Originally, section 1873 had allowed the Director, in fixing the pay of technical and professional personnel, to disregard "the provisions of the civil-service laws and regulations and the Classification Act of 1949." *See* NSF Act of 1950, Pub. L. No. 81-507, § 14(a), 64 Stat. 149, 154–55. The 1968 amendments removed that reference and replaced it with the reference to the title 5 provisions described above. *See* Pub. L. No. 90-407, sec. 12, § 15(a), 82 Stat. 360, 365 (1968). So, when Congress did not include section 5373's cap among those enumerated provisions, Congress knew the cap would apply.

The history of section 5373 likewise confirms that Congress intended this result. The predecessor bill to the 1964 Salary Act, as reported by the House Committee on Post Office and Civil Service, initially only excepted the CIA from the government-wide cap. *See* H.R. Rep. No. 88-899, at 33 (1963). Six months later, the same committee reported a new bill that would become the 1964 Salary Act and added exceptions for the TVA, FDIC, and Comptroller of the Currency. *See* H.R. Rep. No. 88-1388, at 34. The Senate's version of the bill added the Federal Reserve Board, *see* S. Rep. No. 88-1121, at 20, which the House agreed to include in Conference. *See* H.R. Rep. No. 88-1647, at 36 (1964) (Conf. Rep.). And after the Act became law, Congress added other exemptions, including for the CFTC. *See* Farm Security and Rural Investment Act of 2002, Pub. L. No. 107-171, § 10702(c)(3)(C), 116 Stat. 134, 517. But never, across all these amendments and additions, did Congress exempt NSF.

## II.

Some employees are currently making more than section 5373's pay cap, contrary to our interpretation of what the statutes allow. NSF has asked us whether it may continue to prospectively pay salaries above the cap for a finite period for the purpose of lessening the impact on these employees, based on theories of equitable discretion, detrimental reliance, or otherwise. OPM believes that although NSF may waive the collection of any *past* overpayments pursuant to 5 U.S.C. § 5584,[4] NSF lacks authority to continue to overpay employees prospectively for any period longer than necessary to conform employees' pay to the cap. OPM Memorandum at 9 (citing 2 Government Accountability Office ("GAO"), *Principles of Federal Appropriations Law* 9-79 (3d ed. 2006) (explaining that when erroneous payments occur, agency officials should "take reasonable steps to establish adequate controls for future payments" (internal citation and quotation omitted))). We agree with OPM that NSF's authority stretches no further than taking the time necessary to implement the pay cap in an orderly fashion.

Congress conferred substantial authority upon the NSF Director. The Director may, on behalf of NSF, "prescribe such rules and regulations as . . . deem[ed] necessary governing the manner of [NSF's] operations and its organization and personnel," 42 U.S.C. § 1870(a), and "make such expenditures as may be necessary for administering the provisions of" NSF's organic statute, *id.* § 1870(b); *see id.* § 1864(b). But Congress also enacted the pay cap and did not grant the NSF Director authority to pay above that limit. Although "[a]gencies . . . must of course be free to give reasonable scope to the terms conferring their authority[,] . . . they are not free to ignore plain limitations on that authority." *Peters v. Hobby*, 349 U.S. 331, 345 (1955). Nor may agencies ignore statutory commands by creating exceptions based on their judgment of the equities, absent statutory authority to do so. *See Heckler v. Chaney*, 470 U.S. 821, 839 (1985) (Brennan, J., concurring) ("It may be presumed that Congress does not

---

[4] Section 5584 provides that an "authorized official" may, in some circumstances, waive an "erroneous payment of pay . . . the collection of which would be against equity and good conscience and not in the best interests of the United States." 5 U.S.C. § 5584(a). NSF has not asked us, and we express no view on, the extent to which it may waive past overpayments here.

intend administrative agencies, agents of Congress' own creation, to ignore clear . . . statutory . . . commands.").

The decision in *Office of Personnel Management v. Richmond*, 496 U.S. 414 (1990), underscores that this principle applies with particular force when public funds are at issue. In *Richmond*, a government employee gave a disability claimant incorrect advice, and because the claimant relied on that advice, he became statutorily ineligible for certain benefits. *Id.* at 416. Invoking "equitable estoppel," the claimant nonetheless asked federal courts to require that the government pay these benefits. *Id.* The Supreme Court held that the courts lacked such authority. The Court started with "the straightforward and explicit command of the Appropriations Clause"—that "no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *Id.* at 424 (quoting *Cincinnati Soap Co. v. United States,* 301 U.S. 308, 321 (1937)). And because "[a]ll parties . . . agree[d] that the award [the claimant] s[ought] would be in direct contravention of the federal [appropriations] statute upon which his ultimate claim to the funds must rest," it "follow[ed] that Congress ha[d] appropriated no money for the payment of the benefits [the claimant] s[ought], and the Constitution prohibits that any money 'be drawn from the Treasury' to pay them." *Id.* (quoting U.S. Const. art. I, § 9, cl. 7). Hence, "judicial use of the equitable doctrine of estoppel cannot grant respondent a money remedy that Congress has not authorized." *Id.* at 426.

NSF's situation differs from *Richmond* in one respect: The statute NSF would violate by continuing to pay above the cap, 5 U.S.C. § 5373, is not an appropriations statute, and above-cap payments do not appear to violate the relevant appropriation—which simply provides funds for "agency operations and award management." Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, Div. B, Title III, 136 Stat. 4459, 4550 (2022). This situation thus falls outside the "narrow[] ground of decision" *Richmond* found "sufficient to address the type of suit presented [t]here"—that the Court could not approve "a claim for payment of money from the Public Treasury contrary to a statutory appropriation." 496 U.S. at 423–24. But *Richmond* concerned the powers of "federal courts," which "'[u]nless otherwise provided by statute" have available "all . . . inherent equitable powers . . . for the proper and complete exercise of [the courts'] jurisdiction.'" *Liu v. SEC*, 140 S. Ct. 1936, 1947 (2020) (quoting *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946)). "[A]gencies are unlike

federal courts" in that respect. *Id.* at 1946. As "creatures of statute, bound to the confines of the statute that created them," agencies "lack the inherent equitable powers that courts possess." *U.S. Fid. & Guar. Co. v. Lee Invs. LLC*, 641 F.3d 1126, 1135 (9th Cir. 2011). That *Richmond* rejected the claim to the equitable authority at issue there, despite courts' greater claim to equitable powers, underscores our view that agencies generally must seek to "assure that public funds [are] spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents." *Richmond*, 496 U.S. at 428. [5]

We recognize, however, that NSF cannot implement the cap overnight. NSF has informed us that implementing the pay cap will entail administrative actions, such as updating payroll processing systems to accommodate new pay configurations. If NSF is taking the steps necessary for orderly implementation of the cap, we do not think that NSF acts unlawfully simply because those steps entail overpayments for a limited period.

We have applied similar principles before. For example, although the Antideficiency Act generally bars obligating funds in advance of appropriations, agencies during a lapse in appropriations may nonetheless continue activities necessary "for the orderly termination of [unfunded] functions." Memorandum for Alice Rivlin, Director, OMB, from Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, *Re: Government Operations in the Event of a Lapse in Appropriations* at 4 (Aug. 16, 1995). They may do so based on the principle that "statutes that

---

[5] Several opinions of the Comptroller General appear to allow agencies to continue to make payments or expenditures that the Comptroller General determined were contrary to law in order to mitigate the burden on employees. *See In re Dep't of the Interior—Overtime Pay for Prevailing Rate Emps. Who Negotiate Their Wages*, 57 Comp. Gen. 259, 265 (1978); *In re Use of Gov't Vehicles for Transp. Between Home and Work*, 62 Comp. Gen. 438, 438–39 (1983); *In re Mr. James R. Harper*, B-250044 at *1 (Comp. Gen. Feb. 5, 1993); *The Hon. Lawrence E. Walsh*, B-250044 at *1–*2 (Comp. Gen. Feb. 5, 1993). But while the Comptroller General's views can "provide helpful guidance on appropriations matters and related issues," they do not "bind the Executive Branch." *Use of Appropriated Funds to Provide Light Refreshments to Non-Federal Participants at EPA Conferences*, 31 Op. O.L.C. 54, 55 n.1 (2007). We are especially reluctant to give weight to these decisions here because they do not explain the basis for their conclusions, are in substantial tension with *Richmond*, and are more than thirty years old and may no longer even reflect GAO's views.

impose duties on government officers implicitly authorize those steps necessary and proper for the performance of those duties"—and thus when Congress requires that functions cease, it impliedly authorizes the steps necessary to orderly terminate agency operations. *Applicability of the Antideficiency Act Upon a Lapse in an Agency's Appropriation*, 4A Op. O.L.C. 16, 20 (1980); *see Authority for the Continuance of Government Functions During a Temporary Lapse in Appropriations*, 5 Op. O.L.C. 1, 4 (1981) (explaining that agencies have obligational authority that is "necessarily inferrable from the specific terms of those duties that have been imposed upon, or of those authorities that have been invested in, the [relevant] officers" (citing *Fifteen Per Cent Contracts*, 15 Op. Att'y Gen. 235, 240 (1877)); *Participation in Congressional Hearings During an Appropriations Lapse*, 19 Op. O.L.C. 301, 303 (1995) (permitting certain unfunded agency action "by necessary implication from another specific statutory duty or duties"). Similarly, here Congress has authorized NSF to "make such expenditures as may be necessary for administering" NSF's statute, 42 U.S.C. § 1870(b), and required it to implement section 5373's pay cap. NSF thus may take the steps necessary to promptly remedy the prior noncompliance. OPM Memorandum at 9 (citing 2 GAO, *Principles of Federal Appropriations Law* 9-79 (3d ed. 2006)).

GILLIAN E. METZGER
*Acting Assistant Attorney General*
*Office of Legal Counsel*